IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JERRY HOWELL,                    }
                                 }
        Plaintiff,               }
                                 }        CIVIL ACTION NO.
v.                               }        06-AR-0118-S
                                 }
RISING SUN CONSULTING            }
ASSOCIATES, et al.,              }
                                 }
        Defendants.              }

**MEMORANDUM OPINION**

Before the court is the motion of defendants, Rising Sun Consulting Associates ("Rising Sun"), National Psychiatric Billing Service ("NPBS"), Philip M. Coleman ("Coleman"), Jeremy Edwards ("Edwards"), Lawrence Hill ("Hill"), and Carlton Swindle ("Swindle") (together, "defendants"), for summary judgment on the action filed by plaintiff, Jerry Howell ("Howell").  In separate counts Howell claims, without distinguishing between defendants, breach of contract, conversion, negligent training and supervision, negligence and wantonness, fraudulent inducement, and spoliation. Also before the court is defendants' motion to strike.  For the reasons that follow, defendants' motion for summary judgment will be treated as a motion to dismiss and be granted to the extent of dismissing the action without prejudice for lack of subject-matter jurisdiction.  The motion to strike will be deemed moot.

*Facts*

Howell is a physician who practices psychiatric medicine in

Birmingham, Alabama.  Coleman is the founding owner of Rising Sun, a practice-management firm that focuses on the area of behavioral health.  It does business as "NPBS" in Alabama and in other states. In his amended complaint Howell alleges that Rising Sun and NPBS are both sole proprietorships, presumably owned by Coleman. Defendants, to the contrary, aver that Rising Sun and NPBS are corporations.  If the court depended on the parties, it would be left in the dark as to what kind of entities Rising Sun and NPBS actually are.  It may not make any difference except to illustrate the sloppiness in the drafting and execution of the contract in dispute and the imprecision of the pleading and proof.  One of Coleman's titles was "Senior Consultant" for NPBS.  If NPBS was, in fact, no more than Philip Coleman d/b/a/ National Psychiatric Billing Service, Coleman ostensibly employed himself.  Hill, one of Coleman's "associates," if not at some time a partial owner of Rising Sun, was at least an employee or an independent contractor of NPBS.  Hill held the title of "Medical Director."  Edwards and Swindle were employees or independent contractors of NPBS. Edwards's job duties included data entry and submission of claims for physicians who had contracted with NPBS, and Swindle performed data entry and followed up with insurance companies on insurance claims that were submitted by doctors.

On or around January 30, 2004, Howell and NPBS executed a document (the "Billing Service Agreement"), which provided in its

2

entirety:

*THE PARTIES*:

RISING SUN CONSULTING ASSOCIATES, d/b/a National Psychiatric Billing Service (NPBS), and William J. Howell, MD.

The National Psychiatric Billing Service is a medical practice billing service located in Ft. Lauderdale, Florida.  Signature responsibility is in the name of Philip M. Coleman.  William J. Howell, MD is located in Birmingham, Alabama. William J. Howell, MD has signature responsibility for this agreement.

*THE AGREEMENT*:

William J. Howell, MD, agrees to furnish the following information on a timely basis via U.S. Mail, e-mail, and/or facsimile transmission to NPBS.

1.  New patient demographic and insurance information (a new patient information form with a copy of the patient's insurance card).

2.  Insurance verification/certification forms as required by managed care insurance companies.

3.  Complete daily activity billing sheets with patient name, date of service, CPT code, and diagnosis (coded to the fifth digit, i.e., 296.24), and patient payment at time of service information.  Daily billing sheets, along with new patient information, should be transmitted to NPBS each business day for outpatient services via fax or e-mail.

4.  Copies of all Explanation of Benefits (EOB's) including copies of checks from insurance companies and patient payments.  Copies of EOB's and other payment information should be submitted to NPBS at least once per week by "Priority" mail, password protected e-mail attachment, or fax.

5.  Copies of letters of denial, pended claims, and requests for additional information must be submitted to NPBS on a timely basis.

6.   Authorizations and/or pre-certifications and
     general insurance verification are the
     responsibility of William J. Howell, MD. This
     information should be furnished by the
     practice to NPBS as quickly as possible since
     billing cannot proceed until this information
     is received.

National Psychiatric Billing Service agrees to provide
the following professional services:

1.   File insurance claims electronically on a
     timely basis to insurance companies with
     monthly follow up until paid or denied.
     Insurance claims that are more than 30 days
     past the original "filing" date will be
     pursued by telephone and/or the claim will be
     re-filed.

2.   After insurance payment or denial, NPBS will
     transfer the appropriate account balance to
     patient responsibility.

3.   Patient statements will be furnished to
     William J. Howell, MD at a cost of 48 cents
     each (printed, folded, and mailed). If no
     payment on a patient pay balance has been made
     at the end of 90 days, NPBS will elect to
     continue collection efforts *or* to zero out the
     account in the database and return the file to
     William J. Howell, MD to determine final
     disposition of the account. National
     Psychiatric Billing Service is not a
     collection agency.

4.   NPBS will send William J. Howell, MD monthly
     reports of charges, payments, "write offs,"
     and an aged accounts receivable report showing
     all patients in the database. This
     information will also be readily available to
     William J. Howell, MD from any computer
     connected to the internet from a secure,
     password protected website.

5.   NPBS will provide fax copies of a patient
     account ledger (complete account history) when
     requested. This information will also be
     readily available to William J. Howell, MD

4

from any computer connected to the internet from a secure, password protected website. *Because of "confidentiality" issues we cannot release account information directly to the patient by telephone, e-mail, or U.S. mail. This information can be released only by William J. Howell, MD or its designee through a phone call to NPBS or by logging on the billing service web site on the internet.*

6.   NPBS will provide the client practice with master documents of: Daily Business Activity Reports, Superbills (billing tickets), Patient Intake Forms, and Insurance Intake Forms.

7.   NPBS is committed to "data integrity" and compliance with the federal and state mandated rules and regulations of Medicare, Medicaid, and CHAMPUS.  Information to be submitted to the insurance companies (CPT codes, dates of service, places of service, and diagnosis codes) will be provided to NPBS by William J. Howell, MD who is ultimately responsible for the accuracy of the data.  CPT codes, dates of service, places of service, and diagnosis codes *will not be changed* by NPBS in order to get a claim paid.  Any changes in CPT codes, dates of service, places of service, and diagnosis codes from the original data submitted by William J. Howell, MD must be submitted in writing, be initialed and dated. NPBS does not accept any responsibility for incorrect information submitted to the billing service by William J. Howell, MD or his employees.

8.   William J. Howell, MD authorizes signature responsibility to NPBS for health insurance claim forms and other necessary reimbursement documentation.

It should be noted that the National Psychiatric Billing Service is essentially a "paperless" office.  Minimal paperwork is kept on file by NPBS for each patient after data is entered into the computer system.  William J. Howell, MD is responsible for maintaining permanent paper files on his patients with whatever patient and insurance information she deems appropriate for their business.

5

NPBS makes every effort to maintain the integrity of data stored in our computer system.  A backup copy of all practice data will be made daily at three locations including a secure backup facility in Atlanta, Georgia. However, we cannot assume responsibility for acts of God (such as lightning strikes, hurricanes, fires, theft, broken water lines, etc) that destroy or render computerized data useless.

The National Psychiatric Billing Service has adopted the "Model Compliance Plan for Third Party Billing Companies" developed by the Office of the Inspector General (OIG) of the United States and printed in The Federal Register. All services provided by NPBS will comply with HIPAA regulations as they are effective.  Every effort is made to comply with all Federal and State regulations.  The National Psychiatric Billing Service is in compliance with Federal Anti-Kickback statues [sic] and Safe Harbor regulations.

*FEE SCHEDULE FOR BILLING SERVICES*:

A.   <u>Start-Up Fee</u>.  $ 750.00
B.   <u>Monthly Fee</u>.  William J. Howell, MD shall pay NPBS a monthly processing fee of $ 500.
C.   <u>Collection Fee</u>.  In addition to the Monthly Fee, William J. Howell, MD shall pay a fee to NPBS on a montly basis, in an amount equal to five percent (5%) of the net collections on all patient accounts, which net collections are directly related to NPBS' performance of Services.  For purposes of this Agreement, "net collections" shall mean all amounts received per month by William J. Howell, MD for individual patient care including insurance payments, patient co-payments, and other forms of account payment, less refunds or adjustments to those amounts.
D.   <u>Internet Access</u>.  William J. Howell, MD, at her [sic] option, shall be granted secure and unlimited "read only" internet access to all account information for patient data stored on the NPBS billing system for a fee of $ 50 per month.
E.   <u>Patient Statement Fee</u>.  The NPBS .net vendor will print and mail statements at a cost of .48 each.
F.   <u>Monthly Billing Statement</u>.  At the end of each

6

> calendar month, NPBS shall submit a billing statement to William J. Howell, MD setting forth the monthly fee, the collection fee, and any other charges properly due to NPBS for that month.

On-line payment is available on the National Psychiatric Billing web site at: www.shrinkresource.com or a check can be mailed to the Ft. Lauderdale, Florida office. All checks should be made payable to: National Psychiatric Billing Service. A 5% late charge is applied to all accounts that are not paid withing 30 days of the date of the billing invoice.

*IMPLEMENTATION DATE*:

On or about _____1/30/04_____. EOB payment amounts for dates of service beginning with the implementation date for charges submitted by NPBS will be subject to the fee schedule noted above.

*MAILING ADDRESSES OF THE PARTIES*:

National Psychiatric Billing Service
3315 East Oakland Park Blvd.
Suite 202
Ft. Lauderdale, Florida 33308

William J. Howell, MD
Post Office Box 11584
Birmingham, AL 35202

*TERMINATION OF THE AGREEMENT*:

This agreement may be terminated after the first year by either party, for any reason, with 30 days of written notice. At the termination of the agreement, NPBS agrees to return all computerized information and paper files and records to the practice assuming all commissions have been paid by the practice to the billing service. William J. Howell, MD, agrees to pay NPBS the appropriate fees/commission for all billings submitted prior to the termination date of the agreement.

 s/ Philip M. Coleman                          1/30/04

Philip M. Coleman                                          Date
National Psychiatric Billing Service


 s/ William J. Howell                                      1/30/04
William J. Howell, MD                                      Date

                              * * *

In late 2004, Howell became aware of what he believed to be
"several inappropriate and incorrect billing statements to clients
in addition to discrepancies in billing summaries."  Am. Compl.
(Doc. No. 11), at ¶ 11.  Beyond the Billing Service Agreement
itself and Howell's general sense of displeasure with the service
he was provided, the salient facts are conspicuously absent,
especially any proof of compensable damages sustained by Howell.
Mere "aggravation" is not recoverable as an element of damages for
breach of contract and is not compensable in tort in Alabama unless
accompanied by physical injury to the plaintiff.

Howell initiated this action against Rising Sun, NPBS,
Coleman, Edwards, Hill, Swindle, and Practice Admin, LLC on January
19, 2006, invoking jurisdiction based on diversity.  On December
13, 2006, after being informed that Howell and Practice Admin had
successfully mediated their dispute, the court dismissed the action
as against Practice Admin.  The record does not reflect the amount
of the *pro tanto* settlement reached between Howell and Practice
Admin.

*Summary Judgment Standard*

In considering defendants' summary-judgment motion, the court must construe the evidence and make factual inferences in the light most favorable to Howell, the nonmoving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). The court can enter summary judgment only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242-43 (1986) (citations omitted). This determination involves applying substantive law to the pertinent undisputed facts. A material fact is disputed only if a reasonable jury could not return a verdict without resolving the dispute. *See id.* at 248. These rules apply to jurisdictional issues as well as to issues involving the substance of the controversy.

*Analysis*

## I. Subject-Matter Jurisdiction

While evaluating defendants' summary-judgment motion, the court first considers an issue that none of the parties have expressly argued. Defendants have argued that Howell has not supported his claim of damages, and this contention triggers a jurisdictional inquiry. This court constantly monitors its subject-matter jurisdiction, whether raised or not. Whenever it

appears that the court lacks jurisdiction, the action must be dismissed without prejudice.

In affirming this court's remand of an action that was improvidently removed under the Class Action Fairness Act of 2005 ("CAFA"), Pub.L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.), the Eleventh Circuit recently explained that "[c]onsistent with the limited nature of federal jurisdiction, the party seeking a federal venue must establish the venue's jurisdictional requirements." *Lowery v. Alabama Power Co.*, 483 F.3d 1184, 2007 WL 1062769, at *15 (11th Cir., Apr. 11, 2007) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).  In this case the burden is on Howell to establish jurisdiction.  The Eleventh Circuit in *Lowery* went on to explain:

> To illustrate, we begin with the paradigmatic case of a plaintiff filing an original diversity action in federal court.  As discussed in part IV, *supra*, the party who invokes the jurisdiction of the court has the burden of establishing jurisdiction.  Rule 8(a) requires the plaintiff to set forth in the complaint the factual support for jurisdiction.  Fed.R.Civ.P. 8(a).  The plaintiff's factual allegations are subject to Rule 11's command — under pain of sanctions — that the "allegations and other factual contentions have, [or are likely to have following discovery,] evidentiary support [.]" Fed.R.Civ.P. 11(b).  By filing the action in federal court, the plaintiff is making a representation that the action belongs before the court.  *Red Cab*, 303 U.S. at 288, 290, 58 S.Ct. at 590-91.  Because counsel is subject to Rule 11 sanctions, we assume that this representation is made in good faith and that the plaintiff has factual bases for believing that the federal court has jurisdiction to hear the claims.

Despite the plaintiff's representation and our assumption of good faith, if a material element required for either the substantive claim or the court's subject matter jurisdiction is missing from the complaint, the defendant may move to dismiss.  If the plaintiff's counsel concedes that the plaintiff lacks the evidence necessary to cure the deficiency, the court may dismiss the action for failure to state a claim or want of jurisdiction. In either case, without further discovery, counsel cannot in good faith amend the complaint to provide the missing element.  In our hypothetical diversity case, should the plaintiff request leave to conduct discovery to support its assertion that the case is properly before the court, the court would deny such a request.  In such a situation, the court would not reserve ruling on the motion to dismiss in order to allow the plaintiff to look for what the plaintiff should have had-but did not-before coming through the courthouse doors, even though the court would have the inherent power to do so.  In deciding if dismissal is proper, a court would look only to the facts as alleged in the complaint and would not waste limited judicial resources by directing its inquiry elsewhere.

*Id.*, at *20.  In the instant case Howell appears to have conducted some discovery on the issue of his damages, but he falls short in his obligation to prove the existence of the required $75,000 in controversy.

In his amended complaint, Howell purports to invoke the diversity jurisdiction of this court by hopefully averring that "the matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332." Am. Compl. (Doc. No. 11), at 2.  Defendants did not expressly deny this allegation in their answer, but neither did they admit it.   Howell's conclusory allegation of jurisdiction is contained in an unnumbered section titled "Allegation of Jurisdiction." *See id.*, at 1-2.  It

precedes numbered paragraphs that set forth the allegations of fact that speak to the various theories of Howell's case. *See generally id.* Defendants' answer responds to the numbered paragraphs but blandly ignores Howell's "Allegation of Jurisdiction." *See generally* Defs.' Answer (Doc. No. 2). The absence of an express response to the invocation of § 1332(a) does not constitute an implicit admission of Howell's conclusory averment. The court reasons that if defendants had intended to concede the existence of the jurisdictional amount, they would have done so. Under 28 U.S.C. § 1332(a), the amount in dispute must exceed $75,000 in order for this court to proceed.

Although defendants have not moved to dismiss for plaintiff's failure to offer proof of the amount-in-controversy in § 1332(a), they are quick to point out that Howell has failed to produce — or even attempt to produce — any evidence upon which any damages can be quantified or measured. Howell's damages expert opined in his Rule 26(a)(2)(B) report that "[a]t the current time, the damages caused by the Defendants' [sic] can not be determined based on the lack of information provided by the Defendants. This report will be amended when other information becomes available." Pla.'s R. 26(a)[(2)](B) Rep., Ex. H to Defs.' Br. in Supp. of Mot. for Summ. J. (Doc. No. 32-11), at 4. According to the evidence that has been presented, Howell's damages expert has never provided an amended opinion attempting to articulate a theory of damages, much less to

qualify it.  Howell was required under Rule 26(a)(1)(C) to provide defendants "a computation of any category of damages . . . making available for inspection and copying under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered."  Howell has provided no such computation.  His initial disclosures state quizzically that a computation of damages is "Not Applicable."  Pla.'s Initial Disclosures, Ex. 15 to Pla.'s Resp. to Def.'s Mot. for Summ. J. (Doc. No. 41-2, at 93-94), at 2 ¶ C.

The court wonders if Howell really believes that a computation of any category of damages is "not applicable," whatever that means.  It wonders how, if Howell's own damages expert is unable to form an opinion on Howell's alleged damages, Howell can assert, under the constraints of Rule 11, that the requisite jurisdictional amount exists.  If a computation of any category of damages is "not applicable," the court must attempt, on its own, to see if the amount in controversy is more than $75,000.  If a preponderance of the evidence does not demonstrate that a jury could award more than $75,000, the court lacks jurisdiction and must dismiss.

Because of constitutional and statutory constraints, "[s]ubject-matter jurisdiction can never be waived or conferred by the consent of the parties," whether accidentally or on purpose. *Latin American Property & Cas. Ins. Co. v. Hi-Lift Marina, Inc.,*

13

887 F.2d 1477 (11th Cir. 1989) (citing *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982)).  Even if a defendant can, in theory, concede that the amount in controversy exceeds $75,000 for jurisdictional purposes, the court cannot conclude from the procedural circumstances in this case that these defendants have made such a concession, on purpose or by accident.  Defendants point out in more than one place that there is no proof of damages. It would be unreconcilably inconsistent of defendants to concede more than $75,000 in controversy while denying that Howell has demonstrated the existence of any compensable damage.

**II. What is Rising Sun?  Who is NPBS?**

Assuming *arguendo* that the amount in controversy does exceed $75,000 (something the court rejects), the court will discuss, alternatively, the substantive merits of defendants' summary-judgment motion.

The individual defendants (Coleman, Hill, Swindle, and Edwards) assert that their alleged acts and omissions were always performed within the scope of their employment by Rising Sun or NPBS, and that they therefore cannot be held liable in their individual capacities.  This argument makes some sense only with respect to the breach-of-contract claim.  It makes no sense as a defense to the tort claims aimed at individuals.

Howell insists that both Rising Sun and NPBS are sole

14

proprietorships.  *See* Am. Compl., at ¶¶ 2, 3.  He also alleges that Coleman is the owner of both Rising Sun and NPBS.  *See id.*, at ¶ 4. All the evidence reflects that Rising Sun and NPBS are the same entity — for example, the first paragraph of the Billing Service Agreement provides that one of the contracting parties is Rising Sun Consulting Associates, d/b/a National Psychiatric Billing Service.  Assuming *arguendo* that both Rising Sun and NPBS are corporations, one cannot be doing business as the other.  Even if a corporate entity illegally does business under another corporate name, it is still itself.  Assuming that NPBS is, in fact, Rising Sun, and taking for granted paragraphs 2, 3, and 4 of Howell's amended complaint, Coleman, Rising Sun, and NPBS are the same entity.

This is where things get complicated, as if they were not already complicated enough.  Defendants admit that Coleman was the **founding** owner of Rising Sun and NPBS, but they carefully deny that either Rising Sun or NPBS is **now** a sole proprietorship.  *See* Answer, at ¶¶ 2, 3.  Defendants have Rule 11 obligations like Howell does.  They say that both Rising Sun and NPBS are corporations "organized and existing under the laws of the State of Florida," and that they have been such ever since this action was filed.  *See id.*  But what about the date upon which the contract was signed?  Curiously, notwithstanding these representations, neither Rising Sun nor NPBS (which purport to be corporate parties)

filed a corporate disclosure statement under Rule 7.1(a).  That rule mandates:

> **(a) Who Must File: Nongovernmental Corporate Party**.
> A nongovernmental corporate party to an action or proceeding in a district court must file two copies of a statement that identifies any parent corporation that owns 10% or more of its stock or states that there is no such corporation.

Moreover, neither Rising Sun nor NPBS has filed a copy of its certificate of incorporation, nor submitted any evidence to prove that it is incorporated under the laws of Florida.

Because Rising Sun and NPBS have had such a difficult time identifying themselves, the court took it upon itself to investigate.  According to the website of the Florida Department of State, Division of Corporations, there are no entities incorporated in Florida named "Rising Sun Consulting Associates" or "National Psychiatric Billing Service."  There is an entity called "Rising Sun Consulting LLC," but that entity cannot be the similarly named defendant in this action, since it is a limited-liability company, not a corporation. *See* http://www.sunbiz.org.  And even if Rising Sun, when it answered, forgot that it was actually an LLC, not a corporation, "Rising Sun Consulting LLC" could not be the defendant in this case because that limited-liability company did not file its articles of organization until March 2, 2007. *See id.* Defendants state (under the requirements of Rule 11) that Rising Sun "**at the time of the commencement of this action,** and since that time, was and is now a corporation organized and existing under the

16

laws of the State of Florida."   Answer, at ¶ 2 (emphasis added). Because this action was commenced on January 19, 2006, and because Rising Sun Consulting LLC did not exist until March 2, 2007, "Rising Sun Consulting LLC" cannot be the Rising Sun in this case.

Because the parties do not seem to know who they are, the court now informs them that the identities of Rising Sun and NPBS are crucial to determining who can be liable, if anyone can be.   Of course, in a case over which there is no jurisdiction, no one can be liable.   But, if Rising Sun and NPBS are subject to the jurisdiction of this court in this case, it is necessary to know what they are.   Since there is no evidence on the subject excpept what this court dug up, the court will resolve the confusion in favor of Howell, the non-moving party.   So, for purposes of this dispute, Rising Sun and NPBS are sole proprietorships.   They are simply Coleman doing business under these names.   Throughout the remainder of this opinion, these three entities, or non-entities, are synonymous, and their names will be used interchangeably.

### III. Defendants' Motion for Summary Judgment

There are several theories being pursued by Howell against all defendants without distinction.   They will be discussed in sequence.

#### A. Breach of Contract

In his breach-of-contract claim, Howell alleges that NPBS, Coleman, Lawrence, Swindle, and Edwards breached the Billing

Service Agreement by (1) failing and refusing to timely file insurance claims and to follow through and pursue claims with insurance companies, (2) failing accurately and appropriately to transfer balances to patient responsibility, (3) failing to comply with requests for patient billing, to properly pursue collection, or to return files to Howell, (4) not providing accurate monthly reports of account activity to Howell, and (5) not complying with federally mandated rules and regulations. *See* Am. Compl., at ¶¶ 12(A)-(E).

Neither Howell nor any defendant has suggested that the contract is governed by the law of any state other than Alabama. Howell is a resident of Alabama. Coleman is a resident of Florida. The contract was executed in Alabama, or Florida, or in both places. It was apparently to be performed in part in both states. The elements of a breach-of-contract claim in Alabama are (1) the existence of an agreement binding upon the parties, (2) plaintiff's own performance; (3) defendant's nonperformance in a material respect, and (4) damages. *Armstrong Business Services, Inc v. AmSouth*, 817 So.2d 665, 673 (Ala. 2001). If any party had argued for Florida law, and if the court agreed, the elements are the substantially the same in both states. *See Barbara G. Banks, P.A. v. Thomas D. Lardin, P.A.*, 938 So.2d 571, 575 (Fla. 4th DCA 2006) (explaining that the "elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages").

18

Whether the court applies Alabama or Florida law, there is no evidence that a contract ever existed between Howell and any defendant except Coleman.  The Billing Service Agreement is between Coleman, d/b/a NPBS and/or Rising Sun, and Howell.  Nothing in the document suggests any obligation undertaken by Edwards, Hill, or Swindle.  Why Howell's contract claim is aimed at these three individuals is a mystery.  If the court had jurisdiction, these individuals would clearly be entitled to judgment as a matter of law on the contract claim.  The nonexistence of Rising Sun and NPBS as juridical entities eliminates them as contracting parties.  If Howell were entitled to any recovery for breach of contract, he must recover from Coleman.

In arguing that the court should grant summary judgment, NPBS, while erroneously claiming status as a corporation, argues that Howell "is unable to present any evidence, much less substantial evidence, that [NPBS] breached a valid binding contract with the Plaintiff."  Defs.' Br. in Supp. of Mot. for Summ. J. (herein, "Defs.' Br.") (Doc. No. 31), at 13.  Howell's response to the Rule 56 motion in this regard is confusing and difficult to follow, but it takes a stab at citing "evidence" for a breach of contract.  As far as the court can ascertain, Howell points to eight incidents that he characterizes as acts of breach.  Defendants do not directly respond to any of Howell's "evidence," choosing instead to rest on their contention that Howell's "evidence" is illusory.  The

court agrees with defendants that Howell fails to present a *prima facie* case for breach of contract.

First, Howell says that "[o]f the daily reports actually audited by [Coleman], the great majority of them had billing, posting errors." Pla.'s Resp. to Def.'s Mot. for Summ. J. (herein, "Pla.'s Resp.") (Doc. No. 41-1), at 16.   In support of his assertion, Howell refers to nine documents, each entitled "Invoice From National Psychiatric Billing Service" or "Invoice From Rising Sun Consulting Associates." *See* Ex. 14 to Pla.'s Resp. (Doc. No. 41-3, pp. 83-92).   Howell does not identify any errors in these documents.   He simply points to the documents themselves, apparently assuming that the errors to which he refers will be self-evident to the court.   Howell indulges in an erroneous assumption.  First, two of the documents are completely irrelevant because they pertain to accounts for Dr. Kaycia Vansickle, not for Howell.  The other seven documents may contain errors, or they may not, but Howell's merely referring to them, without attempting to identify errors, especially significant errors, is insufficient to overcome defendants' Rule 56 motion.   Moreover, even if some reports generated by NPBS did contain errors, Howell has not attempted to explain how the errors are so substantial, or so material, as to constitute a breach of contract.   In the Billing Service Agreement, NPBS does not promise not to make any inadvertent or insignificant errors on invoices, reports, or other

documents.  The **quality** of NPBS's performance may or may not have been the highest, but NPBS did not guarantee perfection, or total satisfaction to the customer.

Second, Howell contends that "[e]xcept for the first two weeks of the contract, Defendant Coleman reviewed none of the accounts for Dr. Howell."  Pla. Resp., at 16.  The Billing Service Agreement nowhere provides that Coleman will personally "review Howell's accounts."  This alleged shortcoming is insufficient to demonstrate that Coleman breached the contract.  A contract does not obligate a signatory to do more than the contract calls for.

Howell next says that "[d]efendants repeatedly breached the contract by failing to file in a timely or accurate fashion."  *Id.*  Without explaining how a contract, once materially breached, can continue to be "repeatedly breached," Howell purports to support this assertion, citing page 47 of the transcript of Coleman's deposition, by contending that "[t]he daily billing cycle created did not match the claims inputted by [NPBS] and sent to the insurance companies."  *Id.*  That portion of the deposition transcript reveals that the following colloquy took place between Coleman and Howell's lawyer:

A.   (Mr. Coleman):  Okay.

Q.   (Ms. Crew):  And did you indeed go and train [Dr. Kaycia Vansickle's] office staff on-site?

A.   Yes.

Q.   And did you charge a fee for that?

A.   Sometimes.

Q.   All right, so now we're remembering that we did it, right?

A.   Yeah, I was associating that with the billing service, Attorney Crew, I'm sorry.

Q.   Well, did you or did you not?

A.   I did a lot of things for Dr. Vansickle that I didn't do for other clients.

Q.   Did you or did you not provide practice management services to Dr. Vansickle?

A.   We provided training of her staff.

Q.   There you go.  And would you consider that practice management services?

Deposition of Phillip Coleman (herein, "Coleman Dep.") (Docs. Nos. 32-3 — 32-5; 41-3, pp. 25-66).  The court fails to see how this colloquy can establish that Coleman failed to "[f]ile insurance claims electronically on a timely basis to insurance companies" in accordance with the Billing Service Agreement.  The testimony does not refer in any way to Howell.  It only reflects NPBS's treatment of its account with Vansickle, and Vansickle is not a party to this action.

Fourth, Howell says that "Defendants also failed to pursue the insurance claims by phone or re-file them." *Id.*, at 16-17.  Howell supports this assertion by pointing to pages 448 and 452[1] of Coleman's deposition transcript. *See id.*, at 17.  Those pages

---

[1] Howell actually cites page 453 of Coleman's deposition transcript, but that page contains no testimony.  The court believes that Howell intended to cite page 452.

contain the following:

Q.   (Ms. Crew): Would you also agree with me that Blue Cross, Blue Shield only allows refiling for a certain period of time?

A.   (Mr. Coleman): Yes, we went over that the last deposition.

Q.   All right.  And would you also agree with me that if it was unable to be refiled, then that is a claim that is lost, period?

A.   Yes.

Q.   And that is monies that Doctors Howell and Vansickle can simply not recoup?

A.   Yes.  But I also would want to look at the patients ledger.  I imagine that crossed over from Medicare to Blue Cross Blue Shield automatically and that a payment was made.

Q.   You don't have any way of knowing that, do you?

A.   No.

(Off the record discussion.)

(Plaintiff's Exhibit Number 38 was marked and attached to original.)

Q.   Plaintiff's 38 is a patient transaction history on Loring Farmer.  Again, this is your handwriting?

A.   Uh-huh (yes).

Coleman Dep., at 447:21 — 449:2.

Q.   But would you agree with me as well that had you reviewed [documents with posting errors] closer in time to the actual services in this particular instance, you reviewed it in February of '05, but the problems were arising in July of '03, correct?

A.   Yes.

Q.   So, would you agree with me that had you reviewed

23

them closer in time, say, July of '03 or August of
'03, you would have still found these same errors?

A.   Yes, would have found the same errors.

Q.   All right.  I'm almost done.

(Pause in proceedings.)

Ms. Crew: Thank you, Mr. Coleman.

Mr. Sewell: We're done.

Ms. Crew: We're done.

(End of deposition)

*Id.*, at 451:22 — 452:19.  Despite Howell's wishful characterization
of Coleman's testimony, the court fails to see how it can serve as
evidence that NPBS "failed to pursue the insurance claims by phone
or re-file them."  There was no questioning by Howell about any
actual failure by NPBS to pursue or to refile particular insurance
claims.  There was only colloquy regarding a hypothetical scenario
("[W]ould you also agree with me that **if** [an insurance claim] was
unable to be refiled, then that is a claim that is lost, period?")
(emphasis added).  This testimony is insufficient to create a
dispute of material fact about breach of contract.

As a fifth alleged breach, Howell says that NPBS "contracted
to transfer the appropriate account balances to patient
responsibility, yet the contract was breached when that was not
done."  Pla.'s Resp, at 17.  The only evidence cited by Howell to
support this contention is Coleman's affirmative answer to the
following question put to him by Howell's lawyer: "So, the accounts

receivable reports that were based on those documents that were given to the doctors were also incorrect?" *See id.*; Coleman Dep., at 444:16-20.  Howell has offered nothing to establish that NPBS's providing incorrect "accounts-receivable reports" to Howell is tantamount to NPBS's failing to "transfer the appropriate account balance to patient responsibility," as NPBS promised to do in the Billing Service Agreement.  Coleman's said testimony therefore cannot function as evidence of material breach.

Sixth, Howell says that NPBS is in breach because the Billing Service Agreement provided that NPBS "has adopted the 'Model Compliance Plan for Third Party Billing Companies' developed by the Office of the Inspector General (OIG) of the United States," but that "such was not the case."  Pla.'s Resp., at 17.  Howell relies on the deposition testimony of Edwards, NPBS's Billing Service Manager, to support this assertion.  Edwards testified that he did not have any idea what the "Model Compliance Plan for Third Party Billing Companies" is.  *See* Deposition of Jeremy Edwards (Doc. No. 32-6), at 118:2-8.  The fact that Edwards, an employee or independent contractor of NPBS, did not know what the "Model Compliance Plan for Third Party Billing Companies" is, has no bearing on whether Coleman, the only contracting party, adopted said plan.  And if the "Model Compliance Plan for Third Party Billing Companies" had not been "adopted" by NPBS, whatever constitutes "adoption," Howell has not attempted to explain how he

was injured as a result.  Edwards's testimony therefore cannot establish that NPBS materially breached the Billing Service Agreement.

Seventh, Howell notes that NPBS promised that it is "in compliance with Federal Anti-Kickback statutes." Pla.'s Resp., at 17.  Howell says that "[o]ne of those [statutes] states that it is a felony for a physician to refer patients to himself," and that Coleman "acknowledged repeated examples of the claim forms that reflected Dr. Howell referring to Dr. Howell." *Id.*, at 18.  The court is puzzled by Howell's having made this argument.  If Howell is correct that a doctor commits a felony when he refers a patient to himself, he has presented evidence to suggest that **he** — not any defendant in this lawsuit — has violated the anti-kickback statute.  If there is a federal law that proscribes what Howell says it proscribes, and if there are, in fact, NPBS documents that show that Howell referred patients to himself, the court is unable to see how this fact establishes that NPBS materially breached the Billing Service Agreement.  The purported statute, as described, says nothing about a third-party billing company's liability when a doctor who has hired it violates a federal anti-kickback statute.  Instead of confessing to possible criminal conduct by acknowledging "repeated examples" of inculpatory evidence, Howell should, perhaps, be invoking his Fifth Amendment privilege.  There is no material breach here.

Howell mercifully spares the court the continued agony of trying to comprehend what he is complaining about in his breach-of-contract claim, but not until after he makes one last attempt to create a dispute of material fact.   In his eighth and final argument, Howell begins with the proposition that NPBS "contracted to maintain backup copies of all practice data at three locations." *Id.*  The relevant portion of the Billing Service Agreement to which Howell refers provides:

> NPBS makes every effort to maintain the integrity of data stored in our computer system.   A backup copy of all practice data will be made daily at three locations including a secure backup facility in Atlanta, Georgia.

Howell then points to Coleman's deposition transcript, which reveals that NPBS shredded paper copies of "daily sheets" — a practice in which NPBS had routinely engaged.   *See id.;* Coleman Dep., at 290.   Assuming without deciding that "daily sheets" are synonymous with "practice data" — a proposition which Howell does not attempt to establish — NPBS's shredding of paper copies of said daily sheets cannot, *ipso facto*, establish that NPBS did not make computer backup copies of the data contained in them.   In fact, the three sentences preceding the contractual provision to which Howell alludes makes it abundantly clear that:

> National Psychiatric Billing Service is essentially a "paperless" office.  Minimal paperwork is kept on file by NPBS for each patient after data is entered into the computer system.   William J. Howell, MD is responsible for maintaining permanent paper files on his patients with whatever patient and insurance information she deems appropriate for their business.

In light of these clear terms of the Billing Service Agreement, which Howell presumably read and understood before he signed it, Howell cannot be surprised that NPBS shredded paper documents. That NPBS adhered to its practice of not maintaining paper files is not evidence that it breached its contract by failing to make daily computer backup copies of Howell's practice data.

In sum, Howell has not presented any evidence that NPBS failed to perform anything required of it under the terms of the Billing Service Agreement.

Even if Howell had presented some evidence that NPBS was in material breach of the contract, he has not attempted to prove, much less offered substantial evidence of, **damages sustained as a result of the breach**. An essential element of a claim for breach of contract is that plaintiff sustained damages as a proximate consequence of the breach. Speculation and conjecture will not suffice. This is true without regard to the threshold jurisdictional requirement that the amount in controversy exceed $75,000.

An alternative ground for summary judgment asserted by defendants as to the contract claim is that Howell himself terminated the agreement at the end of the year 2005. Howell testified that he had "stopped using" NPBS in 2005, not that he terminated the contract. The supposed shortcomings of NPBS about which Howell complains took place in 2004, before the alleged

28

"termination."  There would be a jury question about whether the contract was "terminated," that is, if jurisdiction existed and if defendants were not otherwise entitled to summary judgment.

**B. Conversion**

As in the contract dispute, the parties all proceed on the supposition that the tort claims are controlled by Alabama law. The court will not quarrel with this supposition although it is questionable.  To sustain a claim of conversion in Alabama, there must be: (1) a wrongful taking; (2) an illegal assertion of ownership; (3) an illegal use or misuse of another's property; or (4) a wrongful detention or interference with another's property. *Drennen Land & Timber Co. v. Privett*, 643 So.2d 1347 (Ala. 1994). Howell relies on two pieces of evidence to support his contention that defendants converted his property.

First, Howell says that defendants "wrongfully detained [Howell's] paperwork and refused to return his account information to him."  Pla.'s Resp, at 22.  Below is the portion of Coleman's deposition testimony that Howell cites to support this contention:

> Q.  (Ms. Crew): And yet Vansickle and Howell had repeated denials of pre-certs, correct?
>
> A.  (Mr. Coleman): I don't know that to be a fact.
>
> Q.  Because you didn't look, right?
>
> Ms. Farley: Object to the form.
>
> A.  [Defendant Swindle] would have told me if there was a pattern of denials for any reason.

(Question read back.)

A.   I don't know.

Q.   And you don't know because you didn't look and check, correct?

Ms. Farley: Object to the form.

A.   Well, correct.

Q.   (Ms. Crew): Now, before there could be a write-off, you were supposed — [Defendant Edwards] testified that you were supposed to have it in writing from the doctor that the doctor agreed to the write-off, correct?

A.   Correct.

Q.   Now, so where at [NPBS] do we keep all of these handwritten documents that authorized all these write-offs?

A.   We're a paperless office.  Those come in and in Dr. Vansickle's case, she instructed us that [Vansickle's office manager] would send those write-offs to us, and there were really very few, and they went into a file or a folder and were kept for a period of time and then shredded.

Q.   So, you shredded — let me step back.

Well, how long a period of time did you keep this permission to do write-offs?

A.   Maybe three to six months.  There was no reason to keep it any longer.

Q.   There was no reason to keep it?

A.   That's correct.

Q.   So, lawsuits didn't come into your mind?

A.   No, we've never been sued.

Q.   And when you — well, where is the directive that we are supposed to shred written permission to do

> write-offs; is that in some policy or procedure handbook y'all [sic] have?

A.   No, no.

Q.   Well how is it that — let me step back.

Coleman Dep., at 121:11 — 123:23.

The cited portion of Coleman's deposition does not support Howell's contention that defendants refused to return his paperwork. No reasonable jury could draw an inference based on Coleman's testimony — testimony that was directed at NPBS's handling of insurance-claim writeoffs sent to NPBS by **Vansickle** — that NPBS "detained" **Howell's** paperwork. Vansickle is not a party to this action. It is Howell who is the plaintiff here. Even if the cited testimony arguably establishes that any defendant converted the property of **Vansickle**, that is irrelevant to the question of whether **Howell's** property was converted. And in any event, even if Howell had shown that NPBS treated his insurance-claim writeoffs in exactly the same manner it handled those of Vansickle, such would be insufficient to prove that NPBS committed the tort of conversion against Howell. Howell offers nothing to suggest that insurance claim writeoffs sent by Vansickle or Howell to NPBS remained the "property" of the senders, so there is no way that NPBS could have "detained" or "interfered with" Vansickle's or with Howell's property by not returning it.

Second, Howell contends that "Coleman acknowledged his refusal to provide [Vansickle's and Howell's] original documentation to

31

them after repeated requests from them even though his contract requires him to provide those documents." Pla.'s Resp, at 22. Howell does not identify the provision of the contract that allegedly obliges NPBS to return to him his "original documentation," and the court is unable to locate any such provision. This may not be fatal to Howell's claim for conversion, as contrasted to his claim for breach-of-contract. NPBS does not dispute that it had possession of Howell's property (Howell's "original documentation"), and it does not deny that it refused to return it after Howell made "two or three" demands for it. *See* Coleman Dep., at 272:14 — 273:3. According to Coleman, NPBS refused to comply with Howell's demands because Howell and Vansickle "hadn't paid their bill." *Id.*, at 273:8-9.

NPBS may or may not have been entitled to hold Howell's property for ransom to force payment. Whether Alabama's or Florida's materialman's lien law covers documents has not been explored by the parties and will not be explored by the court. If Howell did, indeed, owe NPBS for its services, NPBS's better move would have been to sue Howell, and not to withhold his original papers. To do what it did may or may not have constituted conversion. If a jury were to conclude that the "original documentation" to which Howell referred during the deposition of Coleman was Howell's personal property, it might be possible for that jury to conclude that NPBS converted it.

The bigger and the insurmountable problem for Howell comes again from the absence of any proof of damages resulting from any possible conversion.  Before Howell could obtain punitive damages for conversion, he would have to show not only an intentional act but some actual damage, and, as pointed out, Howell has offered no proof of damages beyond mere "aggravation," and certainly not any factual basis for a recovery exceeding $75,000.  When it is apparent from the record that the court could not let a verdict of more than nominal damages for a conversion stand, there is no basis for an exercise of diversity jurisdiction, and the conversion count collapses, just like the other counts collapse.

Coleman, Edwards, and Hill argue that even if NPBS is liable for conversion, they are not liable because their actions were performed within the scope of their employment for NPBS.  This is a totally spurious argument, but one that is unnecessary in view of the lack of proof of any compensable damages.

### C. Negligence — Inadequate Training and Supervision

Howell claims that NPBS, Coleman, and Hill negligently failed to train and supervise Swindle, Edwards, and Practice Admin, and that as a result, there were errors in the bills sent to insurance companies and patients.  Defendants together argue, *inter alia*, that this negligent-supervision claim must be dismissed as to Coleman and Hill because they were at all times acting within the scope of their employment with NPBS.  Not only is this a spurious

argument, but defendants again forget Coleman was NPBS and that NPBS was Coleman.

In order to avoid summary judgment on this claim, Howell must present evidence that he sustained damages as a result of some defendant's negligent training and supervision of Swindle, Edwards, and/or Practice Admin. *See Lane v. Central Bank of Alabama, N.A.*, 425 So.2d 1098, 1100 (Ala. 1983), arising from a duty owed Howell. To repeat the court's constant refrain, Howell has offered no evidence that can arguably prove damages flowing from any alleged negligent training and supervision.

The proof of negligent supervision comes up short.   Howell spends most of his one-page argument on this subject discussing alleged bad acts of Coleman and the various errors in billing which he says resulted from Coleman's alleged substandard supervision of Swindle.   *See* Pla.'s Resp., at 25-26.   To demonstrate once more Howell's lack of any proof of compensable loss, he says that Coleman and NPBS have "already acknowledged the 'significance and scope' of the errors caused by [NPBS]."   He cites to Plaintiff's Exhibit 9 as support for this statement.   That exhibit is a letter from Coleman to **Vansickle**.   That letter evidences a good-faith attempt by Coleman to correct mistakes NPBS made in **Vansickle's** accounts in which Coleman offered to reimburse **Vansickle** for any financial loss that had resulted from any mistakes.   The letter was not written to or about Howell.   There is no suggestion that Howell

even received a copy of the letter.  Howell's name is not mentioned, and there is no suggestion that Howell sustained damages as a result of any negligent training or supervision of any employee or independent contractor.  Coleman, the only defendant who contracted with Howell, did not promise Howell that he would personally train and supervise his employees and/or his independent contractors.  The claim of negligent supervision cannot act as a substitute for the breach-of-contract claim that fails for some of the same reasons.

The mere existence of a contract does not create or imply a separate duty to train every employee to perform it properly.  The court is aware that Vansickle has a suit pending in this court against these same defendants, and that Vansickle and Howell are represented by the same lawyers.  This does not mean that evidence of damages sustained by Vansickle, if any, constitutes evidence of damages sustained by Howell.  Vansickle is not the plaintiff in this case.

**D. Negligence and Wantonness**

In his negligence and wantonness count, Howell alleges that all defendants "willfully and wantonly and/or negligently performed their duties by failing to timely and appropriately bill insurance companies and/or patients, failing to do an accurate accounting and failing to maintain true and accurate reports regarding billing."  Am. Compl., at ¶ 15.  This count is no more than redundant window

dressing.

### 1. Negligence — Duty and Breach

The elements of negligence in Alabama are duty, breach of that duty, and the proximate causation of injury. *Albert v. Hsu*, 602 So.2d 895, 897 (Ala. 1992). Defendants are correct that there is nothing to suggest that Edwards, Hill, or Swindle, in their individual capacities, owed Howell any duty. The sole relationship that could have given rise to a duty to Howell was that between Coleman d/b/a/ NPBS, and Howell. They were the only parties to the contract. *See Ex parte Mobile Light & R. Co.*, 101 So. 177, 179 (Ala. 1924) (explaining that "where parties by contract enter into a relation carrying a legal duty, while one may limit the scope of his duties, he cannot stipulate for protection against negligence in the performance of the duties he does assume"). If, *arguendo*, Edwards, Hill, and Swindle did, in their individual capacities, owe Howell some sort of duty, they cannot be liable for the reasons explained below with respect to NPBS.

Defendants argue that there is no evidence that NPBS breached any duty it owed to Howell, and that in any event, any evidence of damages is "strikingly absent." *See* Def. Br., at 23-24. If Coleman, d/b/a NPBS owed a duty to Howell, Coleman can be liable for the tortious acts of Edwards, Hill, and Swindle, that is, if these individuals were agents of NPBS acting within the line and scope of their employment. *See Joyner v. AAA Cooper*

*Transportation*, 477 So.2d 364, 365 (Ala. 1985).  Because the parties spend no time on it, the court will spend no time trying to decide which individuals were employees of NPBS and which were independent contractors.

### 2. Damages

If, as this court has discussed and re-discussed, Howell has failed to present any proof of damages to support his breach-of-contract claim, his said failure is just as fatal to his negligence and wantonness claims.  The "damages," or lack thereof, are the same, and to the extent any exist they are totally speculative and devoid of the facts needed to meet the test of *Lowery*.

On the claim of negligence, the problem for Howell is compounded because there is no evidentiary basis for claiming the **kind** of damages that Howell seeks, whether speculative or not. Howell strangely relies on *Locke v. Ozark City Bd. of Educ.*, 910 So.2d 1247 (Ala. 2005).  In that case, the Alabama Supreme Court explained:

> [In] *Sims v. Etowah County Board of Education*, 337 So.2d 1310, 1313 (Ala. 1976) . . . this Court stated: " 'It will be observed that a negligent failure to perform a contract express or implied . . . is but a breach of the contract.' " (quoting *Berry v. Druid City Hosp. Bd.*, 333 So.2d 796, 799 (Ala.1976)(quoting in turn *Vines v. Crescent Transit Co.*, 264 Ala. 114, 119, 85 So.2d 436, 440 (1955))). On the other hand, it is true that
>
> > "if in performing [the contract], it is alleged that the defendant negligently caused **personal injury or property damage** to plaintiff, the remedy is in tort, for it is

37

> not the breach of a contract express or
> implied, but the breach of an implied duty to
> exercise due care not to injure plaintiff or
> her property which is the gravamen of the
> action" (emphasis added).

*Vines*, 264 Ala. at 119, 85 So.2d at 440.

Howell cannot proceed on a negligence theory because the injury he says he sustained as a consequence of breach of contract is not of either of the kinds contemplated by Alabama tort law. There was no personal injury and no property damage.

### 3. Wantonness

Since there is insufficient evidence upon which a reasonable jury could conclude that any defendant is liable for negligence, there is also insufficient evidence to show that any defendant is liable for wanton conduct. "To be guilty of wanton conduct, one must, with reckless indifference to the consequences, consciously and intentionally do some wrongful act or omit some known duty, and to be actionable, that act or omission must produce the plaintiff's injury. *Pate v. Sunset Funeral Home*, 465 So.2d 347, 349 (Ala. 1984). Under Alabama law, wanton conduct must be shown by substantial evidence. Ala. Code 1975 § 12-21-12. Howell has presented no evidence, much less substantial evidence, that could establish wanton conduct by any defendant, and in any event, the injury of which Howell complains is not of the kind recognized in Alabama. The court cannot detect any egregious misconduct that would support an award of punitive damages, but if it could, it

could not allow a jury to punish conduct that resulted in no actual, measurable economic loss.

### E. Fraudulent Inducement

If Howell had shown any evidence of damages, the court should examine the fraud claim. It will do so anyway. In order to succeed on his fraud claim, Howell must show (a) that a defendant made a false representation concerning a material fact; (b) that (1) the defendant either knew was false when made, or (2) was made recklessly and without regard to its truth or falsity, or (3) was made by telling Howell that defendant had knowledge that the representation was true while not, in fact, having such knowledge; (c) upon which Howell reasonably relied; and (d) damage proximately resulting from the reliance. *See Reynolds Metals Co. v. Hill*, 825 So.2d 100, 105 (Ala. 2002). Defendants argue that they are entitled to summary judgment on this claim because Howell has not plead any fraudulent act with specificity, and in any event, there is no evidence of misrepresentation, of reasonable reliance, or of damages. The court could, and probably should, stop with the absence of proof of damages, but Rule 9(b) applies.

Under Rule 9(b), Fed. R. Civ. P., "in all averments of fraud and mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Howell does not respond to defendants' argument that he violated Rule 9(b). In the single paragraph of his complaint that charges fraudulent inducement,

Howell alleges:

> Defendants Rising Sun, National Psychiatric, Coleman and
> Hill fraudulently induced Plaintiff to enter into a
> contract for services by promising to timely, accurately,
> and properly, bill the insurance company, maintain the
> accounts, and report to the Plaintiff. Plaintiff relied
> on the representations made by Defendants to his
> detriment and as a result, Plaintiff suffered loss of
> income, risk of loss of license and provider number, loss
> of clients, incurred additional expenses, and suffered
> mental anguish and emotional distress.

Am. Compl., at ¶ 16. This allegation does not come close to
meeting the Rule 9(b) standard for pleading fraud. As the Eleventh
Circuit explained in *Cooper v. Blue Cross & Blue Shield of Fla.*,
*Inc.*, "the plaintiff's complaint must allege the details of the
defendants' allegedly fraudulent acts, when they occurred, and who
engaged in them." 19 F.3d 562, 568 (11th Cir. 1994). Howell's
complaint does not specify any of these things. Even if Howell had
met the requirements of Rule 9(b), the court can find among the
tidbits of evidence none of the necessary elements of fraud. And,
again, with no proof of damages, the jurisdictional threshold is
not met.

**F. Spoliation**

In Count Six of his complaint, Howell alleges that defendants
refused to return to him documents that he had provided pursuant to
his contract, and that this constitutes spoliation of evidence.
This is apparently an alternative to his questionable conversion
count. Spoliation does not constitute an independent cause of
action in Alabama. *Kaufman & Associates, Inc. v. Davis*, 908 So.2d

246, 251 (Ala. Civ. App. 2004); *Christian v. Kenneth Chandler Constr. Co.*, 658 So.2d 408, 413 (Ala. 1995). Rather, it is a jury instruction that is an available remedy when a party is alleged to have spoliated evidence. *Smith v. Atkinson*, 771 So.2d 429, 438 (Ala. 2000). The court would dismiss this claim with prejudice, insofar as it has been alleged by Howell as an independent cause of action, that is, if the entire case were not being dismissed for lack of subject-matter jurisdiction.

**IV. Defendants' Motion to Strike**

After Howell filed his response to defendants' motion for summary judgment, defendants filed a motion to strike ten of the exhibits filed by Howell. Because the court is dismissing without prejudice the entire action, defendants' motion to strike is moot.

*Conclusion*

In accordance with the foregoing, defendants' motion for summary judgment, treated as a motion challenging subject-matter jurisdiction, will be granted.

DONE this 31st day of May, 2007.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

41